# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ANTHONY VICTORY, | Case No. 1:22-cv-01118-JLT-SAB (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DISMISSAL OF ACTION |
| v. | |
| KATHLEEN ALLISON, et al., | (ECF No. 21) |
| Defendants. | |

Plaintiff Michael Anthony Victory is proceeding pro se in this civil rights action filed pursuant to 42 U.S.C. § 1983.

Currently before the Court is Plaintiff's first amended complaint, filed April 17, 2023.

### I.

### SCREENING REQUIREMENT

The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that "fail[] to state a claim on which relief may be granted," or that "seek[] monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); see also 28 U.S.C. § 1915A(b).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Moreover, Plaintiff must demonstrate that each defendant personally participated in the deprivation of Plaintiff's rights.  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Individuals proceeding *pro se* in civil rights actions are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor.  Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) (citations omitted).  To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).  The "sheer possibility that a defendant has acted unlawfully" is not sufficient, and "facts that are 'merely consistent with' a defendant's liability" falls short of satisfying the plausibility standard.  Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

## II.

## SUMMARY OF ALLEGATIONS

The Court accepts Plaintiff's allegations in his complaint as true *only* for the purpose of the screening requirement under 28 U.S.C. § 1915.

Plaintiff names Kathleen Allison, Patrick Eaton, J. Clark Kelso, Joseph Bick, J. Harris, D. Feston, Steve Boyak, Michelle Jachetta, officer Petree, officer Jenkins, and John Does 1 through 5, as Defendants.

### A.     Contraction of COVID-19 in December 2020

Plaintiff arrived at SCC on December 20, 2019.  Plaintiff had his first medical appointment with his primary care physician, Dr. McKay on December 26, 2019.  Dr. McKay noted that Plaintiff had several pre-existing medical conditions, many of which are chronic in nature.  More specifically, Plaintiff suffers from an inguinal left hernia caused by persistent coughing in February 2019.  Plaintiff was prescribed a hernia truss until surgery could be authorized.  Dr. McKay required Plaintiff to be put on the surgery schedule.  Dr. McKay also endorsed Plaintiff for the following accommodations:  low bunk only and low tier; lifting restriction (unable to like more than 19 pounds; and no roof top work.  Dr. McKay also prescribed the following durable

1  medical equipment: hernia truss; eye glasses; straw hat and transcutaneous electronic nerve
2  stimulator.  As of July 10, 2020, October 9, 2020, and February 12, 2021, Plaintiff was awaiting
3  hernia surgery due to the Covid pandemic.  Plaintiff received his left inguinal hernia surgery on
4  July 26, 2021, by Dr. Lue.

5      On June 4, 2020, Plaintiff approached captain D. Feston and captain Harris to inquire as to
6  their purpose for an inspection.  Feston stated his purpose was "getting a better understanding
7  regarding social distancing, disinfectants availability and living conditions in the dorm settings."
8  Plaintiff notified captains Feston and Harris of the lack of disinfectants and lack of six feet social
9  distancing.  Plaintiff gave Feston two pages with three distinct diagrams.  The first page had two
10 diagrams: layout 1 showed a past 32-bed configuration and layout 2 showed a present 32-bed
11 configuration.  The second page had layout 3 showing a proposal for a 20-bed configuration.
12 Feston conducted a cursory review of the layouts and stated he could not accept or possess the
13 layouts.  Feston then handed the two pages to captain Harris.  Harris stated he could keep the
14 diagrams, but his understanding was that Warden Eaton or Secretary Allison would not permit
15 any bed or inmate decrease in the population at SCC.

16     Eaton was the acting Warden at SCC on May 26, 2020, and became Warden in February
17 2021.  Allision was Secretary of CDCR on June 4, 2020.  Joseph Bick was the Director of CCHCS
18 prior to April 2020.  All of these Defendants were put on notice of the assertions made by CDCR
19 in Plata v. Newsom, 445 F.Supp.3d 557, 559-569 (N.D. Cal. 2020).  All of these Defendants
20 personally participated in providing and receiving information to a "Centrally Located Command
21 Center" (CLCC).  The CLCC's goal "is to implement measures and strategies to protect inmates
22 and staff during Covid-19 pandemic and to enhance social distancing and housing options during
23 this time."  Defendants Steve Boyak and Michelle Jachetta are directors at the Tuolumne County
24 Public Health Department (TCPHD) and worked in tandem with: Warden Eaton, CDCR, CCHCS
25 and the Health Care Placement Oversight Program (HCPOP).  There are indications that Boyak
26 and Jachetta oversee some type of "duties" for tasks forces called "The Incident Command Post"
27 and "The Covid-19 Housing Matrix."
28 ///

On June 7, 2020, Plaintiff wrote a personal letter to Clark Kelso informing him of Plaintiff's chronic medical conditions that put him at risk of suffering foreseeable harm; and the lack of six feet of social distancing and the highly congested housing at maximum capacity for the 32 man dorm Plaintiff was living in. Plaintiff attached the two page layout to this letter. Kelso never replied to Plaintiff's correspondence. Both Kelso and Bick were aware of these conditions via the inspection that was performed by one of their employees, i.e. caption Feston. This was confirmed by warden Eaton's correspondence to Plaintiff on March 3, 2021.

On July 15, 2020 and September 8, 2020, Plaintiff's health care grievances log numbers SCC HC 20000253 and SCC HC 20000393 warned Eaton, Kelso, Bick and Allison of non-compliance and foreseeable risk Plaintiff would suffer if exposed to Covid-19.

On December 6, 2020, Eaton announced that SCC was experiencing a dramatic increase in the number of inmates testing positive for Covid-19 and/or reporting Covid related symptoms. In and around the end of November or beginning of December 2020, Easton, Allison, Boyak and Jachetta personally authorized and/or were informed that inmate Shannon Dunkirk and numerous other inmates were to be transported from an unknown fire camp to SCC B-yard to be housed in dorm number 39 prior to being cleared for Covid-19. John Does 1 and 2 personally refused to order the contact tracing protocols at SCC. During this period, a number of unknown inmates tested positive for Covid-19 in dorm number 39. These action/inactions were a repudiation of the Plata litigation.

Patrick Easton was warned of the risk of exposure that Covid-19 presented to Plaintiff via three memos dated April 10, 2020, April 16, 2020, and May 11, 2020. Plaintiff also sent a warning to Eaton on June 4, 2020.

On December 7, 2020, Plaintiff's Covid-19 test results were negative while he was housed in dorm number 52 on B-yard. On December 12, 2020, John Doe 1 authorized inmate Dunkirk to be relocated from dorm number 30 to dorm number 52. Inmate Dunkirk elected to take the upper bunk above Plaintiff who was already housed in the lower bunk. Inmate Dunkirk informed Plaintiff that he was moved from dorm number 30 because a number of inmates had tested positive for Covid-19. Dunkirk informed Plaintiff that John Doe 2 did not perform contract

4

1 tracing protocols prior to him being moved into dorm number 52.

2 On December 11, 2020, Plaintiff tested negative for Covid-19 while housed in dorm 52.
3 Sometime after December 11, 2020, inmate Dunkirk showed symptoms of Covid-19 and tested
4 positive a few days thereafter. Dunkirk was subsequently removed from dorm 52 to an unknown
5 location.

6 On December 18, 2020, Plaintiff tested positive for Covid-18 while housed in dorm 52.
7 Prior to and post December 18, 2020, Plaintiff suffered fatigue, sore throat, cough, headaches,
8 dizziness, brain fog, loss of taste/smell and several pain to abdomen from intestine rupture due to
9 coughing.

10 On February 12, 2021, Plaintiff had an appointment with Dr. McKay regarding
11 symptoms which had not abated. Plaintiff was emotionally distraught with such an onslaught to
12 his cognitive abilities.

13 On March 9, 2021, Plaintiff informed Chief Medical Officer (CME) Katie Brown at SCC
14 by way of health care grievance log number SCC HC 21000167 that he experiencing severe
15 emotional anxiety, nervousness, fear and pain and suffering. Plaintiff feared contracting Covid-
16 19 again and suffering a strike due to his chronic A-fib heart condition. Katie Brown personally
17 decided not to assist Plaintiff by reducing his exposure to foreseeable harm by condoning and/or
18 turning a blind eye to Plaintiff's circumstances.

19 On August 24, 2021, Plaintiff had an appointment with Dr. McKay regarding his persistent
20 cognitive dysfunction that included, mental and physical fatigue, brain fog, vertigo, long/short
21 term memory loss, headaches, diminished smell/taste, severe anxiety, nervousness, general pain
22 and fear of tearing his hernia mesh while recovering from surgery. Dr. McKay stated only by
23 recommending a neurological consult could a "Tilt Table Test" (TT) be performed to help
24 determine if Dysautonomia is possibly causing brain fog, vertigo, and chronic fatigue related to
25 "Long Covid."

26     **B.**    **Contraction of Covid in January 2022**

27 Plaintiff arrived at SCC on December 20, 2019. At SCC there are three separate designated
28 security levels: A-yard which is Level-I; B-yard which is Level-II; and C-yard which is Level-

III. A-yard consists of 32-men dorm living, B-yard consists of 32-men dorm living, and C-yard consists of six buildings with cell living on both the upper and lower tiers.

Plaintiff has been forced to endure the following reassignments between housing units and yards due to being exposed to Covid-19: (a) upon Plaintiff's initial arrival at SCC on December 20, 2019, he was assigned to B-yard, dorm number 52; (b) on December 15, 2020, Plaintiff was moved to dorm number 72; (c) on January 21, 2021, Plaintiff was moved to dorm number 58; (d) on January 17, 2022, Plaintiff was moved to A-yard, dorm number 15; (e) on January 20, 2022, Plaintiff was moved to dorm number 13; (f) on January 27, 2022, Plaintiff was moved to B-yard, dorm number 70; (g) on February 23, 2022, Plaintiff was moved to C-yard, building 1, cell 135; and (h) on approximately March 2, 2022, Plaintiff was moved to cell 103. As of February 24, 2022, Plaintiff is pending transfer to a California Health Care Facility in Stockton.

From February 2021 to January 2022, while Plaintiff was housed in dorm number 58, he had numerous episodes of extreme dizziness that resulted in several falls in the show which aggravated his chronic degenerative disk disease in his lower back. There were no grab bars in the shower or by the toilets. Plaintiff was in fear of calling out for assistance due to humiliation and embarrassment in being seen as vulnerable, weak and naked by other inmates behind the shower curtain. At times, Plaintiff had to sit on the dirty tile shower floor to wash his lower legs and feet due to the increase in dizziness and fear of loss of balance.

On February 1, 2022, Plaintiff appeared before the Board of Parole Hearings (BPH) for his fifth hearing. Both Plaintiff and his attorney set forth the record: (a) Plaintiff's history of long Covid; (b) recent positive test for Covid; and (c) just being released from quarantine. Plaintiff's attorney noted that he would be acting as Plaintiff's ADA assistant due to the unique nature of Plaintiff's symptoms related to long Covid. Throughout the hearing, Plaintiff struggled with his diminished cognitive ability. At more than one point, Plaintiff's legitimacy was criticized and it was asserted that Plaintiff was manipulating the parole panel. After a four hour hearing, the panel denied Plaintiff parole for three years.

On February 4, 2022, Plaintiff filed a health care service request form (CDCR 7362) asserting continuous long Covid symptoms, fear of navigating stairs to the law library, and results

from an MRI brain scan.

On February 7, 2022, Plaintiff was ducated to medical and interviewed by registered nurse Elliot.  Plaintiff was informed he would be scheduled to see Dr. McKay in approximately one week.  Plaintiff's requested Elliot to verity that his low-tier status was still current and easily identifiable in the computer system.  Elliot went to see correctional officer Marsh at the medical check-in station, and Marsh confirmed that Plaintiff's low-tier status was current and correct.

On February 18, 2022, at approximately 10:00 a.m., Plaintiff was ducated for a medical appointment with Dr. McKay.  Plaintiff recited the sequence of events post testing positive for Covid on January 12, 2022, and the vertigo and fatigue he experienced from being wrongfully assigned to dorms 15 and 13 for eleven days climbing the stairs.  Dr. McKay expressed concern on how staff should have known better than to violate a medical designation.  Plaintiff explained that he had an ongoing court case which required research in order to submit filings, but he was unable to safely navigate the two flights of stairs to gain access to the library on the second floor.  Dr. McKay designated Plaintiff as "Disability Partial Mobility" (DPM), "no stairs, needs level terrain."

On February 18, 2022, at approximately 10:25 a.m., Plaintiff was ducted for a meeting at the counselor's office with CCI J. Cordero.  Plaintiff was informed of his DPM status and was ordered to go back to dorm 70 to pack up his property because he was being transferred to C yard Level III to accommodate access to the law library.

On February 23, 2022, Plaintiff appeared for his classification hearing.  It was determined that Plaintiff was to be recommended for transfer to either California Health Care Facility or California Medical Facility.

As of February 24, 2022, Plaintiff was pending transfer to a medical facility, despite being designated "Partial Disability Mobility" based on his chronic medical conditions and Covid-19 symptoms.

On January 13, 2022, Plaintiff tested positive for Covid-19.  From January 10 to January 20, 2022, Plaintiff experienced symptoms of long covid such as extreme fatigue, pain in lower back and knees, brain fog, dizziness, and loss of smell and taste.  Plaintiff is prescribed

Oxcarbazepine 300 mg and 600 mg (2x daily) and Acetaminophen 325 mg (as needed) for pain.

Officer Petree was assigned to supervise E-section of B-yard comprising of dorms 52, 54, 56, 58, 60, 62, and 64. On January 17, 2022, Petree arrived at dorm 52 and called for Plaintiff. Petree instructed Plaintiff to pack up his property as he would be placed in quarantine on A-yard, dorm 15. Plaintiff reminded Petree of his lower bunk and lower tier who acknowledged Plaintiff's status and told him to resolve the matter with officers on A-yard. Plaintiff's medical status is readily accessible and plainly visible for correctional officers to review on their computers under the "strategic offender management system" (SOMS).

Plaintiff requested the assistance of an ADA helper to aid him in having to push a heavy car loaded with approximately 6 to 8 bags of personal and state property from B-yard to A-yard- a distance of approximately 250-300 yards. When Plaintiff informed an unknown officer on A-yard of his medical status, the officer stated Plaintiff would have to carry his property upstairs to dorm 15. Dorm 15 was a designated quarantine dorm, but Plaintiff witnessed an unclean dorm and "black mold" within the shower and other parts of the dorm. The shower valve handle was broken and the end of a toilet brush was used as a make shift hand to turn water on/off. The dorm also had an electric outlet completely hanging out in the wet environment of the bathroom with exposed wiring.

On January 20, 2022, Patrick Eaton and an unknown staff member issued an order to transfer approximately 19 "campers" (who may or may not test positive for Covid) from dorm 13 to dorm 15. This order appeared in contradiction to CDCR memos dated May 11, 2020, January 6, 2022, and January 20, 2022, mandating an extension to a 15-day modified program re movement of inmates to not mix inmates from one housing unit with another housing unit. While Plaintiff was housed in dorm 15, there was no assigned porters to clean or available cleaning supplies.

On January 20, 2022, at approximately 1:00 p.m., Plaintiff was scheduled for an attorney visit via telephone call regarding his upcoming parole hearing. After Plaintiff's attorney call, he returned to dorm 15, at approximately 3:00 p.m. and observed that all of the other inmates and their property were gone. Officer Lambert later informed Plaintiff that he needed to pack up his

8

property as he was moving to dorm 13.  The walls in dorm 13 were also covered in "black mold."  Plaintiff was housed in dorm 13 from January 20 to January 27, 2022.  Prior to his transfer to dorm 13, Patrick Easton, John Doe 5, Steve Boyak and Michelle Jachetta were informed of the existence of black mold and the need for electrical repairs.

On January 27, 2022, Plaintiff was transferred back to B-yard, dorm 70 and told it was designated as a "Resolved Dorm."  Upon entering the dorm, only two other inmates were present.  Plaintiff was housed in this dorm for 11 days and required to navigate two flights of stairs approximately 100 times.  This caused Plaintiff's pre-existing injuries (low back and knees) to be aggravated causing pain, fatigue, and vertigo.  The dorm was not clean, black mold was on the shower ceiling and walls, and several exposed wires hung from lighting fixtures along the back wall.  Plaintiff remained suspect as to the reasoning why the other 6 inmates from B-yard originally did not go too.  Both Eaton and Sprangler personally inspected, condoned and/or turned a blind eye to the knowledge of the unsafe and non-disinfected conditions of dorm 70.  Both Eaton and Sprangler knew that officer Jenkins was not submitting properly filled out "cleaning scheduling templates."  Both Boyak and Jachetta are charged with "investigation of health and sanitary conditions of county jails and detention facilities" and "shall submit a report to the Board of Correction, or other person in charge."  Both Boyak and Jachetta were informed of the conditions of dorm 70 and willfully ignored it being used a resolved dorm.

### C.    Deliberate Indifference to Serious Medical Need

On August 31, 2022, Plaintiff was interviewed by psychiatrist Dr. Inderpal Dhillon via videoconference initiated by Plaintiff submitting an earlier request.  Plaintiff reasserted that "his primary care provider (PCP) Dr. Moyhuddin does not recognize that he has long covid" and how Plaintiff "has diminished cognitive abilities .. wants referral to neurology."  Dr. Dhillon informed Plaintiff in order to receive a diagnosis for long covid  "he has to turn to medical for it."  Dr. Dhillon stated that her department does not offer that service due to a lack of sufficient mental health staff.

On March 9, 2022, after leaving the library at approximately 2:00 p.m., Plaintiff and another inmate returned to building 1.  As inmate King walked into the building, an unknown

inmate approached King and punched him in the head causing him to fall backward and hit his head on the concrete floor. Officer Collier responded and discovered that King was non-responsive and was not breathing. Collier performed CPR until medical staff arrived. Inmate King was stabilized and was transferred to an outside facility.

On April 8, 2022, Plaintiff was issued a walking cane by medical staff Vivian Pina due to his symptoms of vertigo.

On April 11, 2022, Plaintiff was transferred to the California Health Care Facility.

On May 3, 2022, Plaintiff had a medical appointment with Dr. Aliasghar Mohyuddin in which he raised concerns regarding his diagnosis for long covid. Dr. Mohyuddin stated that he did not recognize long covid as a medically recognized disease or disability and would not reissue a wedge pillow that Plaintiff had a permanent chrono for since 2014.

On May 20, 2022, Plaintiff tested positive for covid and was transferred to quarantine on May 21, 2022.

On August 17, 2022, Plaintiff filed a medical request due to persistent symptoms of long covid. On August 18, 2022, Plaintiff was examined and interviewed by medical staff Tiffany Cacho regarding his long covid symptoms and request for a consult with a neurologist. She informed Plaintiff the neurologist could provide a TTT test as well as other tests to determine whether Plaintiff suffered from "dementia" or "dysautonomia."

On August 19, 2022, registered nurse Anish Thampi confirmed and documented Plaintiff's request for the previously recommended neurological consult.

On August 31, 2022, at 1:07 p.m., Plaintiff had an appointment with Dr. Moyhuddin inside of Plaintiff's dorm building. At this appointment, Dr. Moyhuddin was verbally hostile and dismissive by constantly interrupting Plaintiff, even after Plaintiff calmly informed him that he had trouble finding words and finishing his thoughts. Dr. Moyhuddin falsely recorded that it was Plaintiff who "kept interrupting any concert that I would try to give him or when I asked questions…." Dr. Moyhuddin stated there is not a diagnostic test that would help with any definitive diagnosis of long covid. Dr. Moyhuddin falsely and inaccurately asserted Plaintiff "knew exactly what he wanted he was not confabulating he demonstrated no evidence of memory

loss as he continued to site authorities such as CDC and what their definition of long covid was."

## III.

## DISCUSSION

A.   **Conditions of Confinement**

Plaintiff brings claims for contacting COVID-19 in December 2020 and January 2022, while housed at Sierra Conservation Center (SCC).

Conditions of confinement may, consistent with the Constitution, be restrictive and harsh. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006); Osolinski v. Kane, 92 F.3d 934, 937 (9th Cir. 1996); Jordan v. Gardner, 986 F.2d 1521, 1531 (9th Cir. 1993) (en banc). Prison officials must, however, provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986), abrogated in part on other grounds by Sandin v. Connor, 515 U.S. 472 (1995); see also Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982); Wright v. Rushen, 642 F.2d 1129, 1132-33 (9th Cir. 1981).

Two requirements must be met to show an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994). "First, the deprivation must be, objectively, sufficiently serious." Id. (internal quotation marks and citation omitted). Second, "prison officials must have a sufficiently culpable state of mind," which for conditions of confinement claims, "is one of deliberate indifference." Id. (internal quotation marks and citation omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. Id. at 837. The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2006). Mere negligence on the part of a prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton. Farmer, 511 U.S. at 835; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

Extreme deprivations are required to make out a conditions of confinement claim, and

only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Farmer, 511 U.S. at 834; Hudson v. McMillian, 503 U.S. 1, 9 (1992). The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. Johnson, 217 F.3d at 731. Second, the prison official must "know[ ]of and disregard[ ] an excessive risk to inmate health or safety...." Farmer, 511 U.S. at 837. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45.

It is clear that COVID-19 poses a substantial risk of serious harm. See Plata v. Newsom, 445 F.Supp.3d 557, 559 (N.D. Cal. Apr. 17, 2020) ("[N]o one questions that [COVID-19] poses a substantial risk of serious harm" to prisoners.). However, in order to state a cognizable Eighth Amendment claim against the warden, and the other defendants named, Plaintiff must provide more than generalized allegations that the warden and other defendants have not done enough regarding overcrowding or prison movement or housing assignment to control the spread. See Booth v. Newsom, No. 2:20-cv-1562 AC P, 2020 WL 6741730, at *3 (E.D. Cal. Nov. 17, 2020); see also Blackwell v. Covello, No. 2:20-CV-1755 DB P, 2021 WL 915670, at *3 (E.D. Cal. Mar. 10, 2021) (failure to state a claim against warden for failure to adequately control the spread of COVID-19 in the prison); Benitez v. Sierra Conservation Ctr., Warden, No. 1:21-CV-00370 BAM (PC), 2021 WL 4077960, at *5 (E.D. Cal. Sept. 8, 2021), report and recommendation adopted, 2021 WL 4593841 (E.D. Cal. Oct. 6, 2021) (Failed to state a claim on allegations that overcrowding/lack of distance between inmates has exacerbated the conditions leading to transmission of COVID. Plaintiff alleges that there is no way to socially distance, among other conditions.); Sanford v. Eaton, No. 1:20-CV-00792 BAM (PC), 2021 WL 3021447, at *7 (E.D. Cal. July 16, 2021), report and recommendation adopted in part, rejected in part, No. 1:20-CV-00792 NONE BAM(PC), 2022 WL 168530 (E.D. Cal. Jan. 19, 2022 (in order to state a cognizable Eighth Amendment claim against the warden, associate wardens and any other defendants named, Plaintiff must provide more than generalized allegations that the warden, associate wardens and

other defendants have not done enough regarding overcrowding to control the spread.)

The transmissibility of the COVID-19 virus in conjunction with Plaintiff's living conditions, which he claims exposed him to COVID-19, are sufficient to satisfy the objective prong, i.e., that Plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." The pertinent question in determining whether Plaintiff states a claim is whether Defendants' actions demonstrated deliberate indifference to that risk of harm. The key inquiry is not whether Defendants perfectly responded, complied with every CDC guideline, or whether their efforts ultimately averted the risk; instead, the key inquiry is whether they "responded reasonably to the risk." See Stevens v. Carr, No. 20-C-1735, 2021 WL 39542, at *4 (E.D. Wis. Jan. 5, 2021); accord Benitez v. Sierra Conservation Center, 2021 WL 4077960, at *5 (E.D. Cal. Sept. 8, 2021) (same); Sanford v. Eaton, 2021 WL 3021447, at *8 (same).

To state a cognizable Eighth Amendment claim, Plaintiff must provide more than generalized allegations that Defendants did not follow COVID-19 protocols, has not done enough to enforce six-feet social and living distancing, or did not provide sufficient cleaning supplies. See, e.g., Sanford v. Eaton, 2021 WL 1172911, at *6 (E.D. Cal. Mar. 29, 2021) (explaining that "in order to state a cognizable Eighth Amendment claim against the warden, associate wardens and the other defendants named, Plaintiff must provide more than generalized allegations that the warden, associate wardens and other defendants have not done enough regarding overcrowding to control the spread" of COVID-19).

Here, Plaintiff alleges that Defendants failed to prevent exposure to COVID-19 by failing to comply with the six feet social distancing requirement, failure to wear facial masks, failure to properly quarantine inmates, and failure to conduct contact tracing. However, merely alleging these Defendants are required to implement procedures, policies and operations at SCC to protect inmates from exposure to COVID-19 without allegations that they knew of and deliberately disregarded such a risk in Plaintiff's individual case fails to state an Eighth Amendment deliberate indifference claim against them. See Sanford v. Eaton, 2021 WL 1172911, at *6 ("[I]n order to state a cognizable Eighth Amendment claim against the warden, associate wardens, and the other defendants named, Plaintiff must provide more than generalized allegations that the warden,

associate wardens and other defendants have not done enough" to control the spread of the Covid virus.); see also Cedillos v. Youngblood, No. 1:21-cv-00138-DAD-BAM (PC), 2021 WL 2534534, at *6-8 (E.D. Cal. June 21, 2021) (concluding that prisoner failed to state Section 1983 claims due to allegations of "failings in social distancing and unclean cells and showers" during COVID-19 pandemic, where plaintiff failed to allege causal link between defendants and violations); McKissick v. Gastelo, No. 2:21-cv-01945-VAP (MA), 2021 WL 2895679, at *5 (plaintiff "must provide more than generalized allegations that Defendants have not done enough to enforce six-feet social and living distancing, or provided sufficient cleaning supplies, in order to control the spread of COVID-19"); Foster v. Shirley, No. 1:21-cv-00020-DAD-SAB (PC), 2021 WL 2457655, at *3 (E.D. Cal. June 16, 2021) (plaintiff must allege more than generalized allegations regarding what the warden did not do to control the spread of COVID-19); Maney v. Brown, 464 F. Supp. 3d 1191, 1197 (D. Or. 2020) ("the question is not whether [the Oregon Department of Corrections] can do better, the question is whether [it] has acted with indifference to the risks posed by COVID-19.").

Plaintiff's contention that inmate Dunkirk was transferred to his dorm and subsequently tested positive for COVID-19 which lead to Plaintiff also contracting the virus does not demonstrate deliberate indifference on the part of any Defendant. Further, Plaintiff's claim that Defendants did not approve of certain cell dorm configurations as provided by him and/or by CDC does not rise to the level of deliberate indifference. The mere failure precisely to follow CDC COVID guidelines does not suffice to allege a constitutional violation. See Fraihat v. U.S. Immigration & Customs Enforcement, 16 F.4th 613, 639 (9th Cir. 2021) (failure of ICE Covid policies for immigration detention centers to comply fully with CDC recommendations and to "more strongly recommend social distancing" "did not support a finding of deliberate indifference"); Peyton v. Cates, No. 1:22-cv-00151-JLT-EPG (PC), 2022 WL 1430752, at *5 (E.D. Cal. May 5, 2022), adopted, 2022 WL 2307789 (E.D. Cal. June 27, 2022) ("CDC guidance and prison policy are not alone determinative of constitutional requirements") (citation omitted); Jones v. Sherman, No. 1:21-cv-01093-DAD-EPG (PC), 2022 WL 783452, at *8 (E.D. Cal. Mar. 11, 2022) ("the failure to follow certain COVID-19 guidelines, without more, is insufficient to

satisfy the subjective prong of the deliberate indifference standard") (footnote omitted). Furthermore, any alleged failure to impose or enforce testing or mask requirements does not suffice to allege deliberate indifference. See Plata v. Newsom, Nos. 21-16696, 21-16816, 2022 WL 1210694, at *1 (9th Cir. Apr. 25, 2022) (CDCR did not act with deliberate indifference by requiring only workers in healthcare settings, rather than all prison workers, to receive Covid vaccinations, where CDCR "took significant action to address the health risks posed by COVID-19"). The amended complaint fails to set forth sufficient factual allegations to demonstrate that Defendants knowingly disregarded an excessive risk to Plaintiff's health and safety. Rather, Plaintiff's allegations amount to potential negligence, at most, which is not sufficient to give rise to a claim for relief. Accordingly, Plaintiff fails to state a cognizable claim for deliberate indifference.

**B.     Deliberate Indifference to Serious Medical Need**

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. See Farmer v. Brennan, 511 U.S. at 834.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. The following are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. See Farmer, 511 U.S. at 837. The official must both know of "facts from which the inference could

1  be drawn" that an excessive risk of harm exists, and he must actually draw that inference. Id.  If
2  a prison official should have been aware of the risk, but was not, then the official has not violated
3  the Eighth Amendment, no matter how severe the risk. Gibson v. County of Washoe, 290 F.3d
4  1175, 1188 (9th Cir. 2002).

5  "A difference of opinion between a prisoner-patient and prison medical authorities
6  regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337,
7  1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion
8  as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to
9  establish deliberate indifference, see Toguchi v. Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004);
10 Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Mayfield v. Craven, 433 F.2d 873, 874 (9th
11 Cir. 1970). In order to prevail on a claim involving choices between alternative courses of
12 treatment, a plaintiff must show that the course of treatment the doctors chose was medically
13 unacceptable under the circumstances and that he or she chose this course in conscious disregard
14 of an excessive risk to plaintiff's health. Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d
15 330, 332 (9th Cir. 1996) (citing Farmer, 511 U.S. at 837).

16 In his first amended complaint and contrary to the Court's screening order, Plaintiff
17 presents a new claim for deliberate indifference against Dr, Moyhuddin that arose after the instant
18 action was filed and took place at California Health Care Facility in Stockton.

19 California Health Care Facility is located in San Joaquin County, which is part of the
20 Sacramento Division of the United States District Court for the Eastern District of California.
21 Local Rule 120(d).  Pursuant to Local Rule 120(f), a civil action which has not been commenced
22 in the proper division of a court may, on the Court's own motion, be transferred to the
23 proper division of the court. As this claim alleged occurred in 2022, the Court finds no prejudice
24 in dismissing this claim rather than transferring it.[1]  Therefore, to the extent Plaintiff seeks to
25 pursue a claim against Defendant Dr. Moyhuddin for deliberate indifference he should re-file
26 such claim in the United States District Court for the Eastern District of California, Sacramento

---

27  [1] "[D]istrict courts who dismiss rather than sever must conduct a prejudice analysis, including loss of otherwise
    timely claims if new suits are blocked by statutes of limitations." Rush v. Sport Chalet, Inc., 779 F.3d 973, 975 (9th
28  Cir. 2015) (quotation marks and citation omitted).

Division.

## C. Further Leave to Amend

The Court will recommend that first amended complaint be dismissed without leave to amend because Plaintiff was previously notified of the deficiencies and has failed to correct them. A plaintiff's "repeated failure to cure deficiencies" constitutes "a strong indication that the [plaintiff] has no additional facts to plead" and "that any attempt to amend would be futile[.]" See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1007 (9th Cir. 2009) (internal citations and quotation marks omitted) (upholding dismissal of complaint with prejudice when there were "three iterations of [the] allegations—none of which, according to [the district] court, was sufficient to survive a motion to dismiss"); see also Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1084 (9th Cir. 2000) (affirming dismissal without leave to amend where plaintiff failed to correct deficiencies in the complaint, where court had afforded plaintiff opportunities to do so, and had discussed with plaintiff the substantive problems with his claims), amended by 234 F.3d 428, overruled on other grounds by Odom v. Microsoft Corp., 486 F.3d 541, 551 (9th Cir. 2007); Plumeau v. Sch. Dist. 40 Cnty. Of Yamhill, 130 F.3d 432, 439 (9th Cir. 1997) (denial of leave to amend appropriate where further amendment would be futile).

Where a "plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to his claims, the district court's discretion to deny leave to amend is particularly broad." Zucco, 552 F.3d at 1007 (quotations and citations omitted). In light of Plaintiff's failure to provide additional information about his claims despite specific instructions from the court, the Court finds that further leave to amend would be futile and the first amended complaint should be dismissed without leave to amend. Hartmann v. CDCR, 707 F.3d 1114, 1130 (9th Cir. 2013) ("A district court may deny leave to amend when amendment would be futile."). The repetitious filing of conclusory pleadings does not warrant granting Plaintiff additional leave to amend. Accordingly, the Court will recommend that the complaint be dismissed without leave to amend.

**IV.**

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that the instant action be dismissed for failure to state a cognizable claim for relief.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **fourteen (14)** days after being served with this Findings and Recommendation, Plaintiff may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 5, 2023**

UNITED STATES MAGISTRATE JUDGE